# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| J.A. LANIER & ASSOCIATES, INC., | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 4:21-CV-390 |
| v. | § | Judge Mazzant |
| | § | |
| ROBBINS ELECTRA MANAGEMENT, LLC, and CHRISTINE DEFILLIPIS, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (Dkt. #29). Having considered the motion and relevant pleadings, the Court finds the motion should be **GRANTED in part** and **DENIED in part.**

### BACKGROUND

Plaintiff J.A. Lanier & Associates ("Lanier") is a public adjusting firm. Defendant Robbins Electra Management, LLC ("Robbins")[1] served as the property manager of an apartment complex, the Carling on Frankford at 1811 East Frankfort Road, Carrolton, Texas 75007 (the "Carling"). Defendant Christine DeFillipis ("DeFillipis") is an employee of Robbins. Robbins held an insurance policy underwritten jointly by three insurers: Indian Harbor Insurance Company (50%); Certain Interested Underwriters at Lloyds ("Lloyds") (40%); and Interstate Fire & Casualty Company (10%) (the "Master Insurance Policy"). Over the past eight years, Robbins has made multiple claims on the Master Insurance Policy relating to damage to the roof of the Carling resulting from various wind and hail storms.

---

[1] At the time of the events leading up to this lawsuit, the Carling was managed by Robbins Property Associates LLC, which changed its name to Robbins Electra Management LLC and then again to American Landmark Management LLC ("ALM"). For purposes of simplicity—because neither Robbins Property Associates LLC or ALM were named as parties to the lawsuit—the Court refers to the property manager as "Robbins."

### A. The 2016 and 2017 Claims

The first storm at the Carling—that is, the first storm relevant to the parties' dispute—occurred on March 8, 2016 (the "2016 Storm"). The following year, on January 15, 2017, a second wind and hail storm occurred at or near the Carling (the "2017 Storm"). After the 2017 Storm, Robbins submitted an insurance claim on the Master Insurance Policy (the "2017 Claim"). The 2017 Claim listed the date of loss as January 15, 2017. Robbins retained a public adjuster, unrelated to Lanier, to aid in adjusting the 2017 Claim. However, after an inspection of the Carling, the adjuster for the 2017 Claim recommended closing the 2017 Claim and pursing a new claim where the 2016 Storm was the date of loss for the damage to the roof. Robbins heeded this advice and made a new insurance claim against the Master Insurance Policy based on damage arising from the 2016 Storm (the "2016 Claim").

In August of 2017, the insurers on the Master Insurance Policy paid out their proportional share of the 2016 Claim, which had a total allowed claim of $117,897.30. After application of the $100,000 deductible, Robbins received $17,897.30.

### B. DBB Claim

Robbins also had a Deductible Buy-Back Policy (the "DBB Policy") underwritten only by Lloyds. The DBB Policy had a total allowed claim of $75,000. Disappointed with the funds received under the Master Insurance Policy for the 2016 Claim, Robbins made a claim against the DBB Policy (the "DBB Claim"). Like the 2016 Claim, the DBB Claim was made with the operative date of loss as March 8, 2016.

On September 22, 2017, Lloyds denied the DBB Claim. Robbins sought reconsideration of the denial, but Lloyds denied the claim again on November 14, 2017, because Robbins' "claim for windstorm damage to the loss location outline[d] above is not afforded coverage under the

2

policy" (Dkt. #29, Exhibit 3). Finding such an interpretation "extreme," as of November 27, 2017, Robbins decided to take action so as to "prevail on [Lloyds] to make some accommodation" (Dkt. #29, Exhibit 3).

As part of Robbns' efforts to have Lloyds reconsider its denial of the DBB Claim, DeFillippis reached out to Jason Lanier on January 19, 2018. DeFillippis emailed Jason Lanier: "here's the other one I need your assistance with," referring to a claim which required Lanier's adjustment services. The subject line of DeFillipis' email was: "PIB 913302-B / Robbins Property, Associates, LLC – DOL 8 March 2016 – Wind [IWOV-Active.FID603630]" (Dkt. #29, Exhibit 11). "PIB 913302-B" is the claim number assigned to the DBB Claim (Dkt. #29, Exhibit 5). Attached to DeFillipis' email was a separate email thread in which Robbins disputes Lloyds' denial of the DBB Claim.

On January 24, 2018, Lanier emailed DeFillippis a public adjuster contract (the "Adjuster Contract"), pursuant to DeFillippis' request for a "proposal for the Carling effort" (Dkt. #29, Exhibit 12). The Adjuster Contract is a fillable form, with blank lines for the parties to list the insured, list the "public insurance adjuster/company name" being retained, describe the type and extent of the loss, list the date the loss occurred, and provide the method of calculating payment (Dkt. #29, Exhibit 4). The Adjuster Contract lists the "insured" as Robbins, the "retained public insurance adjuster" as Lanier, and describes the "loss or damage" as "wind storm and hail damage to buildings" caused by "wind storm and hail" (Dkt. #29, Exhibit 4). The Adjuster Contract also lists the method of calculating commission as a "straight 10 Percent contingency fee" (Dkt. #29, Exhibit 4). However, for the date "on or about" the loss occurred, the Adjuster Contract merely states "To be determined" (Dkt. #29, Exhibit 4).

On January 29, 2018, DeFillippis emailed Jason Lanier a signed copy of the Adjuster

3

Contract (Dkt. #29, Exhibit 13). Lanier then began the adjustment process.

### C. The 2018 Claim

On June 5, 2018, a third storm occurred at or near the Carling (the "2018 Storm"). By the time the 2018 Storm happened, Jason Lanier had already informed DeFillippis that he believed the damage to the roof arose from the 2016 Storm. Thus, Jason Lanier advised that another claim based on the 2018 Storm should not be pursued. Lanier alleges DeFillipis indicated her agreement with this position in a phone call with Jason Lanier. According to Lanier, DeFillippis conveyed that she believed the damage to the Carling's roof occurred before the 2018 Storm and Jason Lanier should therefore continue his investigation (Dkt. #37, Exhibit 1 ¶ 20).

However, Robbins eventually began to pursue a claim on the Master Insurance Policy for damage related to the 2018 Storm (the "2018 Claim"). By November of 2018, the 2018 Claim had been paid and the roofs at the Carling had been replaced.[2] The allowed claim was $1,804,179.04. After application of the deductible, Robbins received $1,186,640.93. However, the 2018 Claim covered three properties Robbins managed, one of which was the Carling. Thus, Robbins allocated $383,491.55 of the funds it received under the 2018 Claim to repairing the roof at the Carling.

### D. The Lawsuit

Believing itself entitled to payment, Lanier sued Defendants for breach of contract, negligent misrepresentation, common law fraud, fraud by nondisclosure, and promissory estoppel (Dkt. #14). Defendants removed the action to this Court on May 21, 2021, based on diversity jurisdiction under 28 U.S.C. § 1332 (Dkt. #1).

On February 24, 2022, Defendants moved for summary judgment (Dkt. #29). Lanier

---

[2] The details are unclear on when Robbins made the 2018 Claim, when it was paid out, or when the process of replacing the roofs began. To Lanier's credit, it fails to state specifics regarding when Robbins made, and recovered on, the 2018 Claim due to an apparent lack of knowledge. However, Defendants surely know the relevant dates for the 2018 Claim, but nevertheless fail to supply the Court with such details.

responded on April 8, 2022 (Dkt. #37). Defendants filed their sur-reply on April 14, 2022 (Dkt. #38).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure all of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Defendants assert that Lanier has no evidence to support its breach of contract, negligent misrepresentation, common law fraud, fraud by nondisclosure, or promissory estoppel claims. Defendants further ask the Court to make a ruling regarding Lanier's entitlement to attorney's fees. The Court will begin with the breach of contract claim.

**I.     Breach of Contract**

Defendants have two main arguments for why Lanier's breach of contract claim fails as a matter of law. First, Defendants argue the Adjuster Contract did not apply to the 2018 Claim, and because Robbins received funds under the 2018 Claim only, Lanier is not entitled to payment and Robbins is not in breach of the Adjuster Contract. Second, and in the alterative, Defendants maintain the Adjuster Contract is unenforceable because it fails to fully identify the subject matter of the contract. Specifically, Defendants argue the Adjuster Contract is missing an essential term

6

because it lists the date of loss as "To be determined," and thus no contract was ever formed (Dkt. #29, Exhibit 14).

Conversely, Lanier responds that it is entitled to payment under the Adjuster Contract due to its broad language. The Adjuster Contract states Robbins retained Lanier "to assist in the preparation, presentation, and adjustment of *all applicable claims* for . . . wind storm and hail damage to buildings" (Dkt. #29, Exhibit 14). Apparently construing the 2018 Claim to be an applicable claim under the Adjuster Contract, Lanier argues it is entitled to 10% of the funds Robbins received for repair of the Carling. In the alternative, Lanier asserts the Adjuster Contract is not missing an essential term. The Court considers these arguments in turn.

### A. Whether the Adjuster Contract Is Ambiguous

The core disagreement among the parties is what claims the Adjuster Contract applies to—the 2016 Claim, the DBB Claim, or the 2018 Claim—and how the Court may use the surrounding circumstances to resolve that disagreement. Defendants argue the Court may look to the emails between DeFillippis and Jason Lanier, which would show the Adjuster Contract only related to Lanier's adjusting services related to the DBB Claim. Lanier responds that Defendants improperly attempt to introduce parol evidence to narrow the scope of the Adjuster Contract.

It is true that "[c]onsideration of surrounding circumstances is limited by the parol evidence rule[.]" *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018) (citing *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011)). Generally, the parol evidence rule prevents a party from introducing extrinsic evidence to create "an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008). However, if a contract is ambiguous, courts may "consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning

7

of the instrument.'" *Id.* at 450–51 (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)). The parol evidence, therefore, does not "prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution as 'an aid in the construction of the contract's language[.]'" *URI*, 543 S.W.3d at 765 (citing *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)).

If a written contract is so worded that it can be given a definite or certain legal meaning when so considered and as applied to the matter in dispute, then it is not ambiguous. *Columbia Gas*, 940 S.W.2d at 589. But if contract language is susceptible to more than one reasonable interpretation when so viewed, an ambiguity exists. *Id.*

"Contract ambiguity comes in two flavors: patent or latent." *URI*, 543 S.W.3d at 765. "A patent ambiguity is evident on the face of the contract." *Nat'l Union Fire Ins. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). "A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter[.]" *Id.* The Texas Supreme Court often relies on the following example to illustrate latent ambiguity in a contract: a contract calls for goods to be delivered to "the green house on Pecan Street," but there are two green houses on the street. *Id.* at 520 n.4; *see also URI*, 543 S.W.3d at 765 (describing the "green house on pecan street" as a "classic example of latent ambiguity"). In this scenario, extrinsic evidence is admissible to reveal the parties' true intent, but is inadmissible to show "that the parties actually intended for the goods to be delivered to the blue house on Pecan Street" or that "the parties intended additional requirements or constraints that were not expressed in the agreement—such as delivery by 5:00 p.m. or only on Sundays." *URI*, 543 S.W.3d at 766. The Court finds the Texas Supreme Court's decision in *Gallagher Headquarters Ranch Development, Ltd. v. City of San Antonio*, 303 S.W.3d

8

700 (Tex. 2010) instructive here.

In *Gallagher*, the Texas Supreme Court held a latent ambiguity existed as to the matter in controversy. 303 S.W.3d at 702. *Gallagher* involved the City of San Antonio's motion to dismiss the petition for review, which asserted a settlement agreement had mooted the controversy. *Id.* at 701. The settlement agreement settled two separate condemnation cases—one between Petitioner Gallagher and the City and another between Petitioner Chris Hill and the City. *Id.* In the settlement agreement, Gallagher and Hill purportedly agreed to release all claims "arising from or related to the events and transactions which are the subject matter of this cause." *Id.* But the settlement agreement did not expressly identify the case before the court, which involved both Gallagher and Hill along with a third-party (Petitioner Hooper) who was neither named in nor a signatory to the settlement agreement. *Id.* Petitioners argued the settlement agreement did not encompass the appeal. *Id.* Considering the release language and the existence of the pending appeal at the time the settlement agreement was executed, the Texas Supreme Court held that "a latent ambiguity appear[ed] to exist" as it was "unclear whether the case [on appeal] . . . is covered by the Agreement and release." *Id.* at 702.

Similar to the settlement agreement in *Gallagher*, the Adjuster Contract states Robbins retained Lanier "to assist in the preparation, presentation, and adjustment of *all applicable claims*," (Dkt. #29, Exhibit 14) (emphasis added), rather than specifically identifying the relevant claim. Moreover, the surrounding circumstances show the Adjuster Contract could apply to a number of claims, like the settlement agreement in *Gallagher* could have applied to multiple cases. The parties executed the Adjuster Contract on January 29, 2018. By that point, the 2017 Claim was closed. Further, the 2018 Storm did not occur until months after Robbins and Lanier executed the Adjuster Contract. Therefore, the 2017 Claim and 2018 Claim were not viable claims at the time

the Adjuster Contract was executed in January of 2018. However, the 2016 Claim and DBB Claim remain as possible "applicable claims" under the Adjuster Contract. Thus, it is unclear whether the Adjuster Contract covers Lanier's services related to the 2016 Claim, the DBB Claim, or both. As a result, a latent ambiguity exists, and the Court may consider extrinsic evidence to ascertain the intent of the parties at the time of contracting.

On the one hand, several pieces of extrinsic evidence would appear to show the Adjuster Contract related only to the DBB Claim. First, the 2016 Claim had already been paid out by the time DeFillippis contacted Jason Lanier. Second, every single email message exchanged between Jason Lanier and DeFillippis leading up to January 29, 2018—the date the parties executed the Adjuster Contract—contained the subject line: "PIB 913302-B / Robbins Property, Associates, LLC – DOL 8 March 2016 – Wind [IWOV-Active.FID603630]" (Dkt. #29, Exhibits 3, 11–13). "PIB 913302-B" is the claim number assigned to the DBB Claim. Third, in DeFillippis' initial email requesting Lanier's services, she attached internal communications reflecting Robbins' dispute of the denial of the DBB Claim.

On the other hand, the proof of loss for the 2016 Claim attributed the loss at the Carling to wind and hail without distinction (Dkt. #29, Exhibit 1 ¶ 13). In denying the DBB Claim, Lloyds found the "claim for windstorm damage to the loss location outline[d] above is not afforded coverage under the policy" because the damage was from wind only (Dkt. #29, Exhibit 3). Wind damage was not defined in the DBB Policy or Master Insurance Policy (Dkt. #29, Exhibit 1 ¶ 13). Lloyds made the distinction between wind and hail damage because wind damage was not covered under the DBB Policy. Thus, to succeed in reconsideration of the denial of the DBB Claim, Robbins required a re-adjustment of the 2016 Claim that would identify hail as the cause, at least in part, of the damage at the Carling.

10

This conflicting evidence is sufficient to raise a fact issue as to whether Robbins retained Lanier's services to aid in the adjustment of the 2016 Claim, the DBB Claim, or both. *Progressive Cnty. Mut. Ins. C. v. Kelley*, 284 S.W.3d 805, 809 (Tex. 2009). Therefore, a fact finder should resolve the meaning. *Id.* (citations omitted).

That said, Lanier concedes that if "Defendants prove the damage was from the 2018 [S]torm, then Lanier is not entitled to proceeds under the [Adjuster Contract]" (Dkt. #37 at p. 7). This position is consistent with the Court's earlier analysis—the Adjuster Contract could not have applied to the 2018 Claim because the 2018 Storm had not even occurred on the date the parties executed the Adjuster Contract. Accordingly, Lanier's breach of contract claim fails as a matter of law to the extent Lanier claims damages related to the 2018 Storm. Otherwise, summary judgment on the breach of contract claim is not appropriate as there is a fact question on the intent of the parties and whether the wind and hail damage to the Carling resulted from the 2016 Storm.

### B. Whether the Adjuster Contract Is Enforceable

Defendants contend the Adjuster Contract is unenforceable because the date of loss is left open for future negotiations. Lanier responds that date of loss is sufficiently definite when the Adjuster Contract is read as a whole, thus the Adjuster Contract is enforceable.

As an initial matter, to be legally binding and enforceable, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966); *Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App.—San Antonio 1989, no writ). Contract terms are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016); *FFSS v. Corilant Fin., L.P.*, 376 S.W.3d 253, 256 (Tex. App.—Dallas 2012, no pet.). By contrast, if an agreement is so indefinite

11

as to make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. *Moore v. Dilworth*, 179 S.W.2d 940, 942 (Tex. 1944); *Weitzman v. Steinberg*, 638 S.W.2d 171, 175 (Tex. App.—Dallas 1982, no writ).

Defendants are correct that where an essential term of a contract is left open for future negotiations, there is no meeting of the minds, and the contract is not binding. *See Matheson Tri-Gas v. Maxim Integrated Prods.*, 444 S.W.3d 283, 287–288 (Tex. App.—Dallas 2014, pet. denied) (finding that there was no binding contract because parties left commencement date of supply agreement, which was material term of contract, open for future negotiations). However, assuming *arguendo* the date of loss is an essential term of the Adjuster Contract, the Adjuster Contract is nevertheless reasonably certain and sufficiently definite to enable the Court to determine the parties' obligations.

First, the Adjuster Contract describes the date of loss as having already *occurred* (Dkt. #29, Exhibit 14). The Adjuster Contract, therefore, expresses the parties' intent for Lanier to provide adjusting services on claims regarding a date of loss that had already occurred by the time they signed the Adjuster Contract, which could have only been the 2016 Storm. *See Fischer*, 479 S.W.3d at 240–41 (holding contract was enforceable where price was not fixed but expressly provided the purchase price "will include" revenue from pending projects, thereby expressing intent to be bound to pay for work completed on those projects). Second, the primary purpose of a public adjuster is to have an unbiased third party to the insurance claim investigate, evaluate, and assess damage to property. The public adjuster then estimates the cost of repairs to the property. Determining the date of loss could reasonably fall under the adjustment services umbrella. Indeed, the date of loss was still a lingering question at the time Robbins and Lanier executed the Adjuster Contract, and still is today. The legal obligations under the Adjuster Contract were for Lanier to

investigate the damage to the roof at the Carling and estimate the cost of repair. In return, Robbins would compensate Lanier with a percentage of funds received under the insurance policy—although which insurance policy remains a question due to the ambiguity the Court has previously noted. Thus, there is sufficient definiteness as to the material terms of the Adjuster Contract so as to enable the Court to ascertain the parties' intentions. *Somers v. Aranda*, 322 S.W.3d 342, 345 (Tex. App.—El Paso 2010, no pet.) (citing *Inimitable Group v. Westwood Group Develop.*, 264 S.W.3d 892, 899 (Tex. App.—Fort Worth 2008, no pet.)). For these reasons, the Adjuster Contract is not rendered unenforceable because the date of loss lists "To be determined."

Further, less certainty is required for enforcement of a contract in a suit for damages for breach of contract rather than specific performance. *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 133 (Tex. App.—Waco 2005, pet. denied). Lanier seeks damages, not specific performance, and as a result, the bar for certainty is somewhat lower. Finally, the law favors finding agreements sufficiently definite for enforcement where one side has already performed its side of the bargain. *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 623–24 (Tex. App.—San Antonio 1996, writ denied). The parties do not contest Lanier performed under the Adjuster Contract. Accordingly, because the Court has already found the Adjuster Contract sufficiently definite, the law favors its enforceability.

Consequently, Defendants' arguments for judgment on the breach of contract claim are not persuasive. Summary judgment is not appropriate on Lanier's breach of contract claim, except to the extent Lanier claims damages for the breach of contract claim related to the 2018 Storm. The Court will now turn to Lanier's remaining claims.

## II. Fraud by Nondisclosure

Lanier has also brought a claim for fraud by nondisclosure. It is important to start by noting

13

that a mere failure to disclose information does not constitute fraud unless there is a duty to disclose such information. *Bradford v. Vento*, 48 S.W.3d 749, 755–756 (Tex. 2001) ("failure to disclose information does not constitute fraud unless there is a duty to disclose the information"); *Pellegrini v. Cliffwood-Blue Moon Joint Venture, Inc.*, 115 S.W.3d 577, 580–581 (Tex. App.—Beaumont 2003, no pet.) (finding there was no duty to disclose information because both parties were experts in subject matter of contract and negotiations involved an arms-length transaction); *Marshall v. Kusch,* 84 S.W.3d 781, 786 (Tex. App.—Dallas 2002, pet. denied) (holding original seller of ranch was under no duty to disclose anthrax outbreak to subsequent purchaser who purchased ranch from different seller). Defendants assert summary judgment is warranted because they had no duty to disclose the information at issue, namely, that Robbins was pursuing the 2018 Claim. Lanier responds that DeFillipis had a duty to disclose the 2018 Claim because it made her prior statement—that she believed the damage was from the 2016 Storm, rather than the 2018 Storm—untrue.

Generally, a duty to disclose may arise in four situations. *BP Am. Prod. Co. v. Marshall*, 288 S.W.3d 430, 446 (Tex. App.—San Antonio 2008), *rev'd on other grounds*, 342 S.W.3d 59 (Tex. 2011). First, if the parties have a confidential or fiduciary relationship, there may be a duty to disclose. *See Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 562 (Tex. 2019) (holding relationship between franchisor and prospective franchisee is not "special or fiduciary one," so former had no duty to disclose). Second, a person may assume a duty to disclose when he or she voluntarily discloses partial information but fails to disclose the whole truth. *Marshall*, 288 S.W.3d at 446 (finding oil production company assumed duty to disclose whole truth when its agent voluntarily made representations concerning lease). Third, a duty arises when a person makes a representation and fails to disclose new information that makes the earlier

14

representation misleading or untrue. *Id.* Finally, a duty arises when a person's partial disclosure conveys a false impression. *See, e.g.*, *Nelson v. Najm*, 127 S.W.3d 170, 175 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (noting literally true statement that owner had no problem with government was nevertheless actionable because it created false impression). Whether a duty to disclose exists is a question of law for the court. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). The Court finds DeFillipis, or someone from Robbins, had a duty to disclose Robbins was pursuing a claim for damage to the roof at the Carling related to the 2018 Storm.

"One who having made a representation which when made was true or believed to be so remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him is morally and legally in the same position as if he knew that his statement was false when made." *Susanoil, Inc. v. Continental Oil Co.*, 519 S.W.2d 230, 236 n. 6 (Tex. App.—San Antonio 1975, writ ref'd n.r.e.). In *Susanoil*, the court found that because an assignee of oil leases and equipment originally stated that it would treat all assignors equally, the assignee had duty to disclose when it later made a more favorable agreement with one particular assignor. *Id.* at 236. *Susanoil* has been oft-cited for the proposition that one who learns their originally-true representation became untrue after it was made has a duty to disclose that information to those relying on the original representation. *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 168 (Tex. App.—Eastland 2001, pet. denied); *Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 212 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *Hart v. Wright*, 16 S.W.3d 872, 878 n.3 (Tex. App.—Fort Worth 2000, pet. denied). Here, DeFillipis' comment that she believed the damage to the Carling's roof was from before 2018 and Lanier should therefore continue the adjustment process became misleading and untrue as soon as Robbins began pursuing the 2018 Claim. That said, the holding in *Susanoil* is typically limited to situations in which the

relevant omission occurs *before* parties enter a formal agreement. *See Oliver v. Rogers*, 976 S.W.2d 792, 803–04 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (citing *Susanoil*, holding that a party's failure to inform the other party to a contract of the first party's decision not to perform the contract is not actionable as fraud if the decision not to perform was made after the transaction closed) (emphasis added). To be sure, the parties had already executed the Adjuster Contract before DeFillipis' statement to Jason Lanier. Even so, the proposition still stands— Robbins had a duty to disclose to Lanier it was pursuing a claim that could render his services moot.

A general duty to disclose information in an arm's-length business transaction may arise when a party makes a partial disclosure that, although true, conveys a false impression. *Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 162 (Tex. 1995); *see, e.g., Bradford v. Vento*, 48 S.W.3d 749, 755–56 (Tex. 2000); *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.— Houston [14th Dist.] 1997, pet. denied); *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 636 (Tex. App.—San Antonio 1993, writ denied). Furthermore, when there is a duty to speak, silence may be as misleading as a positive misrepresentation of existing facts. *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979) (citing *Rowntree v. Rice*, 426 S.W.2d 890 (Tex. Civ. App.—San Antonio 1968, writ ref'd n.r.e.)). DeFillipis—on behalf of Robbins—made a representation to Lanier which conveyed the false impression that his company's services were still needed. In doing so, a general duty to disclose information arose. *Prudential Ins.*, 896 S.W.2d at 162. Thus, once Robbins pursued and successfully closed the 2018 Claim, DeFillippis—or anyone else from Robbins—had a duty to disclose those facts, not remain silent.

That said, a duty to disclose is merely the first step in a fraud by nondisclosure claim. Texas law still requires Lanier to prove: (1) the defendant deliberately failed to disclose material

16

facts; (2) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (3) the defendant intended the plaintiff to act or refrain from acting based on the non-disclosure; and (4) the plaintiff relied on the non-disclosure, which resulted in injury. *Bombardier Aero. Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–220 (Tex. 2019); *Wise v. SR Dall., LLC*, 436 S.W.3d 402, 409 (Tex. App.—Dallas 2014, no pet.); *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 507 n.27 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). On these remaining elements, the Court finds there is a factual dispute better saved for the trier of fact. Thus, Lanier's fraud by nondisclosure claim survives Defendants' motion.

### III. Other Claims

Defendants contend Lanier lacks evidence to support any of its other claims for negligent misrepresentation, common law fraud, and promissory estoppel. However, after a careful review of the record and the arguments presented, the Court is not convinced that Defendants met their burden demonstrating that there is no material issue of fact as to these claims thereby entitling them to judgment as a matter of law. Thus, Defendants' motion is denied as to these claims.

### IV. Attorney's Fees

Lanier seeks an award of attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code and, alternatively, under the doctrine of promissory estoppel. Defendants seek judgment as a matter of law that Lanier is not entitled to fees because it brought its breach of contract claim against a limited liability company, which is neither a corporation or an individual. In its response, Lanier apparently concedes it cannot pursue a claim for attorney's fees against Robbins, and instead focuses solely on its ability to recover fees from DeFillipis, an individual. Because there are fact issues for the jury to resolve on all of Lanier's claims, the parties' arguments regarding attorney's fees are premature. Thus, the Court will defer ruling on this matter.

## CONCLUSION

It is therefore **ORDERED** Defendants' Motion for Summary Judgment (Dkt. #29) is hereby **GRANTED in part** and **DENIED in part**. Plaintiff's breach of contract claim fails as a matter of law as to any damages arising from the 2018 Storm. Otherwise, all claims, including the breach of contract claim as it relates to damages from the 2016 Storm, survive Defendants' motion.

**IT IS SO ORDERED.**
SIGNED this 11th day of August, 2022.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE